**AETNA HEALTH MANAGEMENT, INC., Plaintiff,**

v.

**MID-AMERICA HEALTH NETWORK, INC.; and Healthnet, Inc., Defendants.**

**No. 97–2332–JWL.**

United States District Court, D. Kansas.

Aug. 7, 1997.

---

John K. Power, Joseph H. Knitting, Husch & Eppenberger, Kansas City, MO, for Plaintiff.

Douglas S. Laird, Robert J.E. Edwards, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

MARTEN, District Judge.

Plaintiff Aetna Health Management, Inc. has brought the present action against Mid–America Health Network, Inc. alleging violations of contractual agreements between the parties. Following the filing of its complaint on July 3, 1997, plaintiff moved for a restraining order, and an agreed order was subsequently adopted by the parties. The court also entered an order providing for expedited recovery. In addition, the court set a date for hearing Aetna's arguments in favor of a preliminary injunction.

This matter was temporarily transferred to the undersigned for the purpose of expeditiously addressing Aetna's motion for injunctive relief. In addition to that motion, Aetna has filed a motion to amend its complaint by adding as a defendant Mid–America's affiliated entity, HealthNet, Inc. Defendant Mid–America has moved for a protective order seeking to preserve from disclosure either the entirety or portions of 25 documents. A hearing on all outstanding motions was held August 4, 1997. For good cause shown and for the reasons stated at that hearing, as further discussed herein, the motion to amend is granted, the motion for protective order is denied subject to the restricted disclosure ordered by the court for certain documents, and the motion for preliminary injunction is granted.

With respect to the motion to amend complaint, the motion is granted since no responsive pleading has yet been filed. The court has reviewed *in camera* the documents subject to the requested protective order, and finds no merit to HealthNet's argument that the documents are protected by attorney-client privilege, are either nonresponsive to plaintiff's requests or not relevant to its claims, and that they touch on confidential commercial matters protected by law. Accordingly, as directed at the hearing on this matter, unredacted versions of the documents will be produced to the plaintiff. As a partial exception to this directive, as the court noted at the hearing, documents 14 and 17 are an exception in that they reflect relatively detailed information relating to specific proposals. These documents shall be produced to counsel for Aetna. Counsel for Aetna shall not share the documents or information derived from them with Aetna without approval of the court.

A preliminary injunction is an extraordinary remedy which is granted as the exception rather than the rule. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). The main purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits in order for the trial court to render a meaningful decision. *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1198 (10th Cir.1992). To obtain a preliminary in-

junction, the movant must demonstrate that: (1) it will suffer irreparable injury in the absence of an injunction; (2) this injury outweighs whatever damage the injunction may cause the opponent; (3) the injunction is consistent with the public interest; and (4) there is a substantial likelihood it will eventually prevail on the merits. *Chemical Weapons Working Group v. U.S. Dept. of the Army,* 111 F.3d 1485, 1489 (10th Cir.1997); *City of Chanute v. Kansas Gas & Elec.,* 754 F.2d 310, 313 (10th Cir.1985); *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

■■■■ Injunctions which seek to modify the status quo by requiring mandatory action are subjected to a higher standard; the movant is required to demonstrate that the factors supporting injunctive relief "weigh heavily and compellingly in the movant's favor." *SCFC ILC, Inc. v. Visa USA,* 936 F.2d 1096, 1098–99 (10th Cir.1991). Mandatory injunctions will not be granted in doubtful cases where the facts and law do not clearly favor the movant. *American Carriers v. Baytree Investors,* 685 F.Supp. 800, 806 (D.Kan.1988).

The movant has the burden to establish by clear and unequivocal proof its right to a preliminary injunction. *Penn v. San Juan Hospital,* 528 F.2d 1181, 1185 (10th Cir.1975). Mere allegations are not sufficient. *Kansas City, Kan. Frat. Order of Police v. City of Kansas City,* 620 F.Supp. 752, 768 (D.Kan. 1984). The grant or denial of a preliminary injunction rests within the sound discretion of the trial court. *Tri–State Generation and Transmission v. Shoshone River Power,* 805 F.2d 351, 354 (10th Cir.1986); *Amoco Oil Co. v. Rainbow Snow,* 748 F.2d 556, 557 (10th Cir.1984).

■■■ On January 1, 1996, Aetna and HealthNet[1] entered into a "Network Access Agreement." This agreement, known in the health insurance industry as a rental access agreement, provided access for Aetna's clients (which include "payors" and "members," usually employers and their employ-

ees) to managed health care products of HealthNet. Managed health care products include PPOs, which feature generally looser managed care and have a fee differential of around 20%, and PPSes, which are characterized by aggressive managed care and impose larger pay differentials for persons going outside the system.

Prior to the formal implementation of the Network Access Agreement, Aetna in 1994 and 1995 entered into confidentiality agreements to preserve the confidentiality of its client lists. Under these agreements, client information would be utilized by HealthNet only for billing and administrative purposes. Access to the information was restricted to persons with a "need to know."

Under the Network Access Agreement,

HealthNet is prohibited from marketing its provider network to Payors during the term of this Agreement for one year thereafter. This provision does not prohibit HealthNet nor AHM from responding to requests for proposals issued by a Payor or by a Payor's agent.

(Network Access Agreement, ¶ 2.15.)

The Agreement also provided:

This Agreement may be terminated without cause upon ninety (90) days prior written notice.

This without cause termination provision is subject to AHM's obligation to operate a network for the provision of Covered Services to Members. Therefore, HealthNet agrees that if HealthNet terminates this Agreement without cause HealthNet Provider will, at AHM's election, continue to provide Covered Services to Members of specified Plans until the next Plan renewal date or twelve (12) months, whichever comes first.

(Network Access Agreement, ¶ 5.2.)

In January of 1997, HealthNet learned that Aetna planned to enter the Kansas City market directly by implementing its own provider network. The evidence produced to

---

1. The defendants are identified collectively herein as "HealthNet." Although defendants argue they represent separate legal entities, and that accordingly the wholly-owned subsidiary Health-Net, Inc. cannot be held to the restrictions im-

posed by the Network Access Agreement, the court finds such a distinction inappropriate in light of the evidence of defendants' indiscriminate use of the term "HealthNet" through the history of the relations between the parties.

the court establishes that HealthNet decided to implement a "disruption strategy" under which it sought to "convert" Aetna's clients. This disruption strategy was explicitly stated in HealthNet documents to be "along the same lines" of an earlier strategy (Tazioli Depo. at 109), in which HealthNet successfully converted many clients of Mutual of Omaha when that insurer also decided to implement its own provider network.[2] Unlike Aetna, however, Mutual of Omaha had not included restricted marketing provisions in its contracts with HealthNet.

A basic feature of HealthNet's strategy was contacting brokers, who are used extensively in the health insurance industry to match payors with insurers, with the intent that they would in turn communicate with Aetna's payors. In his deposition, Tazioli agreed that HealthNet was "hoping to communicate with brokers in such a fashion as to create in the brokers' mind[s] at least the perception that they needed to switch their business from Aetna to HealthNet...." (Tazioli Depo. at 173.)

The targeting of Aetna clients is the subject of many internal HealthNet documents discussing its strategy. On February 17, 1997, HealthNet's market place development committee met, with "discussion focused on the 48,000 members in the Aetna block of business and strategies to avoid losing the membership." (Pltf.'s Ex. 7.) Minutes of the meeting reflect that HealthNet's Marketing and Sales Division "will include an analysis of ways to convert the Aetna membership." (Id.) Another undated HealthNet document discussing Aetna states as a "General Strategy" that HealthNet would "[i]nitiate a disruption strategy to create a need for HealthNet product/network within local divisions of Aetna cases." (Pltf.'s Ex. 8.)

The market place development committee minutes from May 5, 1997 state that

> HealthNet is prepared to make a decision on the timing for the cancellation of the current contract and will adopt an aggressive communication strategy to facilitate

the conversion of Aetna business to HealthNet. The communication strategy will allow the market place to learn that Aetna is attempting to take over, but that the opportunity to avoid network disruption exists by aligning (remaining?converting?) with HealthNet.

(Pltf.'s Ex. 9.)

In connection with their strategy, HealthNet prepared a marketing analysis of Aetna's current client makeup. The only way such an analysis could have been prepared was through allowing marketing personnel access to Aetna's in-force client information in violation of the Aetna–HealthNet confidentiality agreements.

On June 30, 1997, HealthNet's senior vice president for sales and marketing, Rob Tazioli, wrote to Aetna's assistant director, Emelia DeMusis Dasse, that HealthNet would be terminating the Network Access Agreement effective October 1, 1997. On July 2, 1997, HealthNet issued a statement marked "FOR IMMEDIATE RELEASE" which provided:

> Starting October 1, 1997, HealthNet will no longer offer any HealthNet provider networks through health insurance products sold by Aetna. HealthNet and Aetna have had a contractual relationship since 1988, through which customers of Aetna's managed care insurance products used the HealthNet network of physicians and hospitals in the [Kansas City, Missouri] metropolitan areas. In 1996, Aetna merged with U.S. Health Care, a national managed care company. Contract continuation discussions between HealthNet and Aetna failed to produce a mutually satisfactory agreement. Aetna is in the process of developing a managed care network of providers that will compete with HealthNet. Affected employer groups who elect to remain with HealthNet can begin the transition immediately or at their contract renewal dates.

(Pltf.'s Memo., Tab 1, Ex. D.) A newspaper article based on the press release appeared

---

**2.** Although HealthNet claims in opposition to the motion that this discussion of a Mutual of Omaha strategy occurred only in preliminary discussions of what to do in response to Aetna's provider network, it is notable that HealthNet has failed to present any substantial evidence documenting this change of outlook.

in the *Kansas City Star* headlined "Health-Net terminates its Aetna contract."

Although Aetna promptly contacted HealthNet and gave notice of its election of continued service under ¶ 5.2 and expressed its concern that the press release was misleading, HealthNet agreed to make only insubstantial changes in the release.

The court finds Aetna has presented clear evidence supporting its motion, and that this evidence weighs heavily and compellingly in its favor. Aetna has demonstrated a likelihood of success on the merits, showing that HealthNet violated paragraphs 2.15 and 5.2 of the Network Access Agreement as well as the confidentiality agreements.

The court is unpersuaded by the distinction between "payors" and "brokers" which HealthNet seizes upon in its brief. Health-Net argues it was not prohibited under the terms of the Network Access Agreement from marketing to brokers since such a proscription does not appear explicitly in the terms of the agreement.

HealthNet's argument errs for several reasons. First, it would have the effect of destroying any meaning for ¶ 2.15, since the uncontradicted evidence is that, with few exceptions, most marketing of access is accomplished through brokers rather than directly to payors. HealthNet's argument would have the effect of rendering meaningless an important and bargained-for provision of the Network Access Agreement. Second, the evidence establishes that brokers are in any event the agents of the payors. Communications directed at brokers are inherently directed at their clients.

More importantly, however, by its explicit terms the agreement prohibits HealthNet from "marketing" its provider network to Aetna's payors. "Marketing" by its nature is a broad term, incorporating acts which "expose [a product] for sale in a market." *See* Webster's Ninth New Collegiate Dictionary 1635 (Merriam–Webster 1984). In the modern commercial environment, "marketing" is not restricted to direct, face-to-face communications, but encompasses all communications, direct or indirect, which have the intent of causing or assisting the dissemination of product information.

HealthNet's actions clearly had such an intent. Its communications to brokers were only indirect parts of its strategy, since brokers themselves do not pay for access to providers. The brokers play a role only by serving payors, and the specific intent of HealthNet's disruption strategy was that these targeted payors would be the clients of Aetna.

Aetna also demonstrated substantial and irreparable injuries from the actions of the defendants, and that these injuries are not subject to effective remedy by monetary damages at trial. The press release was markedly, and, the court believes, intentionally misleading, causing the ordinary reader to believe that "services" would be discontinued October 1, 1997. Notwithstanding HealthNet's focus on a single, rather inconclusive sentence buried in the text of the release, when read in full, the release still misleadingly suggests that Aetna clients should be concerned that after October 1, 1997 they may no longer have coverage for services.

That this interpretation is correct may also be seen from the evidence the plaintiff introduced demonstrating actual confusion by the public. HealthNet declined to make more substantial changes in the press release on the ground that the public in the local market were "educated customers" who could understand how it affected their rights to coverage. The court finds this defense of the press release is as wrong in fact as it is insincere in motive. Evidence produced to the court shows confusion not simply by ordinary citizens, but by physicians as well. Substantial injury has also been shown in the damage to Aetna's plan to implement its own provider network.

The evidence supports the conclusion that the damage to HealthNet from the injunction is not substantial. HealthNet is not prohibited from all marketing to brokers. The injunction requires only that as a result of such broker contacts HealthNet may not, for a limited time, accept business from Aetna payors.

Finally, the court finds clear and compelling evidence that the preliminary injunction will advance the public interest. First, the public interest is served by a recognition of the binding nature of contracts voluntarily agreed to by responsible persons. Second, the public interest is advanced by ensuring public access to information which is not misleading and does not cause panic and confusion about a matter as important as health insurance coverage. Finally, the public interest is advanced by competition in the health insurance industry, competition which HealthNet attempted to defeat by breaching its contractual obligations.

IT IS ACCORDINGLY ORDERED this 7th day of August, 1997, that the motion for preliminary injunction (Dkt. No. 2) is granted according to the terms stated at the conclusion of the hearing on August 4, 1997; the motion to amend complaint (Dkt. No. 17) is granted; and the motion for protective order (Dkt. No. 19) is denied, except as stated herein.