**AETNA HEALTH MANAGEMENT, INC., Plaintiff,**

v.

**MID–AMERICA HEALTH NETWORK, INC., and HealthNet, Inc., Defendants.**

No. 97–2332–JTM.

United States District Court, D. Kansas.

Jan. 24, 2000.

John K. Power, Husch & Eppenberger, Kansas City, MO, Joseph H. Knittig, Husch & Eppenberger, LLC, Overland Park, KS, for Aetna Health Management, Inc.

Douglas S. Laird, Robert J. E. Edwards, Polsinelli, White, Vardeman & Shalton, Kansas City, MO, for Mid–America Health Network, Inc., HealthNet, Inc.

*ORDER*

MARTEN, District Judge.

The matter is now before the court on Aetna's motion seeking a determination the defendants violated agreements between the parties, and that it is entitled to attorney fees. In earlier proceedings familiar to the parties, the court granted Aetna's request for injunctive relief. *Aetna Health Management v. Mid–America Health Network,* 975 F.Supp. 1382 (D.Kan. 1997). For the reasons identified herein,

the court finds that the plaintiff's motion must be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita* ). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpret-ed in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Findings of Fact

Aetna is engaged generally in the business of providing healthcare plans and healthcare providers access to contracting employers (known as "payors") and to their employees (known as "members"). HealthNet is a managed care organization that provides healthcare services (i.e., doctors) in the Kansas City Metropolitan Area, and is comprised of Mid–America Health Network, Inc., and its subsidiary, HealthNet, Inc. HealthNet is engaged in the business of, among other things, renting access to networks of healthcare providers.

In their response to the motion for summary judgment, the defendants (collectively here identified as "HealthNet") stress that "HealthNet" is not a legal entity. They contend that both HealthNet, Inc. and Mid–America operated in the marketplace, and did sometimes distinguish between themselves. Mid–America operates and sells a "PPO" provider network of physicians and hospitals. At the time of the agreement, HealthNet, Inc. sold only an HMO product.

However, the evidence before the court establishes that HealthNet and Mid–America frequently made no distinction between themselves to the public, and often they do not make any internal distinction between themselves. Further, although defendants contend that HealthNet, Inc. never contracted with Aetna, the 1995 confidentiality agreement—which forms a key part of the claims of the plaintiff—was not, according to the express terms of the agreement, a contract between Aetna and Mid–America, but a contract "between HealthNet ('HN') and Aetna Health Management, Inc. ('AHM')." (Plf.Exh.6).

In 1994, Aetna and HealthNet entered into discussions about the possibility of

Aetna renting access to the HealthNet provider network of healthcare providers. Pursuant to Aetna's standard operating procedure in negotiating the potential rental network arrangement, Aetna and HealthNet discussed the terms of the confidentiality agreement before the parties shared any information. On August 22, 1994, HealthNet and Aetna entered into a confidentiality agreement.

The August, 1994 agreement applied to "all information which is considered proprietary to Aetna, or any of its affiliated companies, including, but not limited to, information or materials related to the business affairs or procedures of Aetna and it's (sic) affiliated companies." (Def.Exh. E, at ¶ 19). According to the testimony of Emelia DeMusis Dasse of Aetna, the primary purpose for the agreement was "protecting our network information, as well as protecting any information that they shared with us through the process of completing a contract negotiation with them." (Plf.Exh. 4, at 22). The idea behind the confidentiality agreements was basically that the information that was to be shared between the two organizations was solely for the purpose of furthering the business relationship.

The 1994 confidentiality agreement (Plf.Exh.5) states:

2. [Aetna] and [HealthNet] shall use the Confidential Information solely for the purposes of contracting negotiations and any continuing business relationship anticipated and shall not disclose any Confidential Information received from each other or each others agents hereunder to any person or entity except employees, officers, or agents of [Aetna] or [HealthNet] who have a need to know and who have been informed of [Aetna's] and [HealthNet's] obligations under the Agreement.

. . . .

5. [HealthNet] agrees to indemnify and hold [Aetna] harmless against any claim, liability, loss or expense (including reasonable attorney fees) arising from a) [HealthNet's] use or disclosure, or the use or disclosure by [HealthNet] officers, directors, employees or agents, of Confidential Information, or b) from actions taken to enforce the terms of this Agreement.

. . . .

6. [Aetna] and [HealthNet] acknowledge that each party to this Agreement and/or its affiliates, successors and assigns may suffer immediate and irreparable harm to its goodwill and business which may not be compensatable by damages alone in the event of a breach, whether actual, threatened or attempted, of the obligation to safeguard the Confidential Information. In the event of any such breach, threatened breach or attempted breach by either party to this Agreement, its officers, directors, employees or agents then the other party and/or its affiliates, successors and assigns, in addition to any other rights, remedies or damages available at law or in equity, shall be entitled to obtain a temporary, preliminary or permanent injunction in order to prevent or restrain any such breach, threatened breach or attempted breach and the moving party will not be required to post bond as a condition for granting such relief.

On December 7, 1995, Aetna and HealthNet entered into a second confidentiality agreement. The purpose for the second confidentiality agreement was to protect Aetna's utilization management information because it was delegating that function to HealthNet. The 1995 confidentiality agreement (Plf.Exh.6) provides:

3. [HealthNet] shall use the Confidential Information solely for the purpose of performing delegated utilization management services as more fully described in the Delegated Utilization Management Agreement between the parties, effective January 1, 1996 and shall not disclose any Confidential Information hereunder to any person or

entity except employees, officers or agents of [HealthNet] who have a need to know and who have been informed of and agreed to comply with [HealthNet's] obligations under this Agreement....

5. [HealthNet] agrees to indemnify and hold harmless [Aetna], its affiliates and their respective directors, officers, employees and agents, for that portion of any liability, judgment, settlement, loss or expense (including reasonable attorney's fees) which was caused by [HealthNet's] negligence, breach of this Agreement, willful misconduct, criminal conduct, or fraud arising out of or in any way connected with [HealthNet's] disclosure of Confidential Information to any person or entity except employees, officers or agents of [Aetna] or Providers as allowed in Paragraph 3 of this Agreement, or from actions taken to enforce the terms of this Agreement.

6. [HealthNet] acknowledges and agrees that [Aetna], its affiliates, successors, and assigns will suffer immediate and irreparable harm to its or their goodwill and business which cannot be compensated by damages alone in the event of [HealthNet's] breach, whether actual, threatened or attempted (each of which shall be considered a breach), of the obligation to safeguard the Confidential Information. In the event of any such breach by [HealthNet], its officers, directors, employees, affiliates, successors and assigns, in addition to any rights, remedies or damages available at law or in equity, [Aetna] shall be entitled to obtain a temporary, preliminary or permanent injunction to prevent or restrain any such breach. The moving party will not be required to post a bond as a condition for granting such relief.

In mid–1995, representatives of Aetna and representatives of HealthNet began discussing the preparation and formation of an amended and restated network access agreement. It is undisputed that the process of preparing this agreement was very much a collaborative process in which the negotiations between the parties lasted several months before there was a final contract. Everyone had an opportunity to discuss any and all provisions in the contract. On January 1, 1996, Aetna and HealthNet entered into the amended and restated network access agreement (the "agreement").

The defendants' response stresses that HealthNet, Inc. was technically a separate company from Mid–America, and that HealthNet, Inc. never formally contracted with Aetna. In furtherance of this argument, the defendants contend that the 1996 access agreement was entered into between Aetna and Mid–America only. In fact, the document (Def.Exh.1) provides for an agreement between Aetna and Mid–America Health Network, Inc. ("HealthNet"). During the drafting of the agreement, HealthNet provided organizational charts to Aetna, and Aetna and HealthNet discussed its organizational structure. At no time during these discussions was HealthNet, Inc. identified as an entity separate and distinct from HealthNet or Mid–America. Further, defendants' argument that HealthNet, Inc. did not contract with Aetna is belied by their failure to controvert, and therefore their admission, of Aetna's uncontroverted fact ¶ 11, which states that "Aetna and HealthNet entered into a second confidentiality agreement."

The 1996 agreement (Plf.Exh.1) provides, in part, the following:

2.15 HealthNet is prohibited from marketing its provider network to Payors during the term of this Agreement and for one year thereafter. This provision does not prohibit HealthNet nor [Aetna] from responding to requests for proposals issued by Payor or by a Payor's agent.

....

5.2 This Agreement may be terminated without cause upon ninety (90) days prior written notice.

This without cause termination provision is subject to [Aetna's] obligation to operate a network for the provision of Covered Services to Members. Therefore, HealthNet agrees that if HealthNet terminates this Agreement without cause HealthNet Provider will, at [Aetna's] election, continue to provide Covered Services to Members of specified Plans until the next Plan renewal date or twelve (12) months, whichever comes first.

. . . .

**6.6 *Indemnification by HealthNet.*** HealthNet agrees to indemnify and hold [Aetna] and Payors and their respective officers, agents and employees harmless from any and all liability, loss, damage, claim, or expense of any kind, including costs and attorneys' fees that results from negligence, willful misconduct, criminal conduct, breach of this Agreement, fraud or breach of fiduciary responsibility by HealthNet or its officers, agents or employees in connection with the duties and obligations of HealthNet under this Agreement.

The agreement is generally known in the healthcare industry as a rental access agreement in which Aetna rents access to HealthNet's network of healthcare providers. The managed health care products Aetna sells to its payors include plans in which HealthNet provides a network of participating providers for Aetna's payors and members through HealthNet's provider network. Specifically, Aetna uses HealthNet's network to offer its payors and members preferred provider organizations ("PPOs"), point of service arrangements ("POSs"), and exclusive provider organizations ("PCPs"). Aetna contracts with its payors; HealthNet does not contract with Aetna's payors. Many Aetna payors and members are aware that their health care services are provided by HealthNet's provider network.

In addition to renting Aetna access to its provider network, HealthNet maintains its own HMO product that utilizes Health-Net's provider network. Thus, Aetna's products and HealthNet's competing products rely upon the same provider network. Exhibit 2, at ¶ 19.

HealthNet also has a special arrangement with other carriers that compete against Aetna, and also pay to access HealthNet's Kansas City provider network. During the time of the preliminary injunction issued by this court, Reliastar and NYLCare paid to access HealthNet's Kansas City Provider Network. Reliastar and NYLCare sell PPOs. At the time of the injunction, HealthNet competed against Aetna through NYLCare locally (in the Kansas City area), and through Reliastar locally and nationally.

There is a fact dispute as to Aetna's ability to market its products in the Kansas City area. According to Aetna, its only means to market its product is through the brokerage community, the consultants. HealthNet has provided evidence that entities operating PPOs and HMOs frequently directly market their products to employers. As to Aetna, in particular, however, the evidence is that during the relevant time period, it marketed its products solely through brokers. Aetna planned to market directly to employers after its own provider network was "up and running" (Prelim.Inj.Hrg.Tr., Plf. Exh. 4, at 55–56).

Brokers in the managed health care industry represent the employers or "payors," and help payors choose insurance carriers, such as Aetna, who provide health care products to payors and members.

Marketing through brokers constitutes marketing to payors. Robert Tazioli, HealthNet's Senior Vice President of Sales and Marketing, has testified that he considered brokers to be the agents of payors. Tazioli knew that insurers can "interact directly with employer groups through brokers." (Def.Exh. 3, at 279). It is uncontroverted that a single broker might be the agent for five to 500 payors, and thus marketing through brokers is an extreme-

ly efficient manner of marketing in the managed health care industry. Thus, carriers, like Aetna, use brokers to access as many payors as possible, and market their products through brokers to convince brokers that their clients should choose their products, as opposed to those of other carriers in the industry. Although there are exceptions, as HealthNet's evidence demonstrates, it is uncontroverted that brokers are the focal points of marketing campaigns in the managed healthcare industry.

In January or February of 1997, HealthNet learned of Aetna's plans to develop its own provider network. Upon learning of Aetna's plans to form its own HMO, HealthNet began planning a marketing scheme to convert Aetna's customers. HealthNet does not controvert the fact that, at this same time in which it "was scheming to convert Aetna's business, it was also exploring various ways it could amend the Agreement and retain the relationship." (Plf.Uncontr. Fact ¶ 36). HealthNet's proposed revised agreement changed the current relationship between Aetna and HealthNet in a number of ways, including allowing HealthNet the right to market its HMO and dual option products directly to Aetna's customers.

Mid–America embarked on a marketing strategy of aggressive communications through the agents of Aetna's payors, the brokers. HealthNet, Inc. also engaged in this marketing strategy to make the scheme a key part of its marketing.

Sometime between February and June 1997, as part of its marketing strategy against Aetna, HealthNet's accounting department began sharing with its marketing department, Aetna's in-force client list. The only use HealthNet's marketing department would have for the Aetna in-force client list would be to use the information against Aetna to take away its client base.

HealthNet knew, when it embarked upon the strategy of aggressive communication and disruption, that under the agreement, it could not market its MAPP and PPO network to Aetna members or groups, nor could it directly market its Reliastar dual product. As HealthNet understood the agreement "the key [was HealthNet could not] initiate the interest in the product with the group directly or indirectly with a broker." (Plf.Exh.11). Even though HealthNet knew it was not permissible under the agreement, it decided to communicate with brokers who represented Aetna's payors "in such a fashion to create in the brokers' minds at least the perception that they needed to switch their business from Aetna to HealthNet." (Tazioli Dep., Plf.Exh. 3, at 173). HealthNet planned to market through press releases, with knowledge that payors would see whatever HealthNet published in local newspapers.

To plan a strategy precisely targeted at Aetna's business, HealthNet used Aetna's confidential client list in its possession to plan its marketing strategy. An undated HealthNet memo discusses HealthNet's marketing strategies, including the following:

> Direct contact by mail all Aetna cases to promote product/network options no later than 3/1/97 ... Direct contact all offices of significant size or known satisfaction no later than 3/1/97 ... Initiate a disruption strategy to create a need for HealthNet product/network within local divisions of Aetna cases.

(Plf.Exh.12). According to HealthNet and Tazioli, these notes merely reflect hypothetical discussions which were not carried out. HealthNet does not attempt to controvert the existence of policies reflected in other company documents. Thus, minutes from the HealthNet Market Place Development Committee for May 5, 1997 state:

> As Aetna has yet to respond to HealthNet's proposal to partner for business in Kansas City, it is assumed that Aetna has no intention of working with HealthNet, and is just using this time to develop a network. In light of this, HealthNet is prepared to make a decision on

the timing for the cancellation of the current contract and will adopt **an aggressive communication strategy to facilitate the conversion of Aetna business to HealthNet.** The communication strategy will allow the marketplace to learn that Aetna is attempting to take over, but that the opportunity to avoid network disruption exists by aligning (remaining? converting?) with HealthNet.

(Plf.Exh.13) (emphasis added).

Two days later, the same committee decided: A script will be devised to use for external communication which will lay the groundwork in the market place for any occurrences involving HealthNet and/or Aetna/U.S. Healthcare. The script will provide an effective means to communicate the information that Aetna is attempting to take over, but that the opportunity to avoid network disruption exists by signing with HealthNet.

(Plf.Exh.14).

A memo entitled "Aetna/U.S. Healthcare Strategy," identified confidential information regarding Aetna's client makeup, outlined steps to complete marketing strategy before termination. This document could not have been prepared without using Aetna's confidential client list in HealthNet's possession.

It is uncontroverted that an e-mail dated June 23, 1997, among HealthNet strategists setting some final preparations for implementation of HealthNet's marketing strategy states:

Heads up. Today or tomorrow, we will be wanting to get out a communication to brokers re: HN's relationship with Aetna. Rob left me a voice mail on Friday. I suggest either a special issue of HN FAX or a letter from Rob. We should use our current Sprint fax system for speed. Rob will have the key message points-who, what, why, where, when. Stand by.

(Plf.Exh.16). Another e-mail on the same date reported:

Rob tells me that Dave will take over this initiative. The audience is brokers

and current employer group contacts. Dave and Laurie will develop message points; Kerry, get with them ASAP, please. Document must be reviewed by Coni, Andy, Tom, H., Rob and Tim Dalbom. Distribution goal should be the end of this week or early next week. Timing is important to coincide with letter to Aetna, terminating contract. Ginger, how are we doing on Sprint fax list of employers from Michelle? Again, let's consider a special edition of HN Fax or a one-page letter. THX

(Plf.Exh.17).

On July 1, 1997, HealthNet gave written notice to Aetna that it was terminating the agreement, without cause, pursuant to Section 5.2 of the agreement, which permits HealthNet to terminate the agreement without cause upon 90 days' prior written notice.

Upon receipt of the written notice, Patrick Young, general manager for Aetna/U.S. Healthcare, contacted Andy Dani, HealthNet's CEO, to gain the clear understanding that HealthNet was terminating Aetna, and to make certain that HealthNet understood that HealthNet was going to continue to provide services to Aetna's members, as they were contractually obligated to do. During the conversation between Mr. Young and Mr. Dahl, Mr. Young read paragraph 5.2 to Dahl.

It is uncontroverted that on July 2, 1997, HealthNet issued a press release stating "Starting October 1, 1997, HealthNet will no longer offer any HealthNet provider networks through health insurance products sold by Aetna." After receiving this release, Young contacted Dahl, told him it was misleading, and asked him to retract the statement and to cease and desist in the communication.

It is uncontroverted that, during this conversation, Young told Dahl that the statement in the press release that "HealthNet will no longer offer any HealthNet provider networks through health insurance products sold by Aetna"

implied that Aetna would no longer provide services even though the contract clearly stated that it needed to continue to provide services for the next renewal date or 12 months, whichever came first. Dahl told Young the release was well written and that the Kansas City consumer was educated and would understand what was meant by the word "any." Young also objected to the language which stated "effective employer groups that elect to remain with HealthNet can begin the transition immediately or at their contract renewal dates" because it constituted a solicitation to employer groups to move to HealthNet.

It is uncontroverted that, contemporaneously with the notice of termination and press release, HealthNet also sent letters, signed by its Vice President of Marketing and Sales, Rob Tazioli, to persons it identified as "HealthNet Brokers." Many of these "HealthNet Brokers" are the brokers to whom Aetna directly markets its products. These letters advised the brokers that HealthNet would "no longer offer any HealthNet networks through Aetna-sponsored products starting October 1, 1997." (Plf.Exh. 1, at 152). The letters continued, stating that "[a]ffected employer groups who elect to **remain** with HealthNet can begin the transition immediately or at their renewal dates." (Id.) (emphasis added). Again, Aetna's payors never entered into a contractual relationship with HealthNet. Finally, the letters invited brokers who wished to inquire about available HealthNet products to call HealthNet at a given telephone number.

It is uncontroverted that the external execution of HealthNet's strategy makes no distinction between MidAmerica and HealthNet, Inc.

The disruption strategy is also shown in a memo dated July 2, 1997 which was distributed among HealthNet marketing strategists:

An article will probably run in tomorrow's Kansas City Star about HealthNet's relationship with Aetna. You may get some calls. Here are some things you can say:

1. Starting October 1, 1997, HealthNet will no longer offer any HealthNet provider networks thru insurance products sold by Aetna. HealthNet made this decision because Aetna is developing a competing network of providers. This change does not apply to TWA who contracts directly with HealthNet.

2. Affected employer groups who elect to remain with HealthNet can begin the transition immediately for implementation of a change for contract renewal dates after October 1, 1997.

3. Members with questions about the impact of this change should contact their personnel departments or HR managers.

(Plf.Exh.18).

It is uncontroverted that, on July 3, 1997, Aetna reiterated to HealthNet its objections and concerns regarding HealthNet's breach of the agreement, and notified HealthNet of its election, pursuant to § 5.2 of the agreement, for HealthNet to continue to provide covered services to Aetna members under specified plans until the next renewal date of such plans or twelve (12) months, whichever came first.

In response to this strategy, HealthNet received calls from brokers inquiring as to "what was happening." (Plf.Exh. 19, at 58). There is evidence that 20 to 40 brokers representing Aetna payors immediately contacted Aetna concerned that Aetna could offer no health care provider network after October 1, 1997. At least one brokerage firm, the Power Group, contacted Aetna by letter to notify Aetna of its confusion regarding termination of services through Aetna insurance plans.

On or around July 24, 1997, Aetna received a copy of a letter from Debbie Nelson, the office manager for David Caplin, M.D., to Rita Cortez. The letter notified Ms. Cortez that, from the physician's perspective, effective October 1, the pa-

tient-member would no longer have any network to access.

It is uncontroverted that, because the general release of the press statement and the extensive correspondence to doctors, letters to brokers, and letters to hospitals, Aetna has been unable to ascertain how many of its payors and members erroneously believed that they would lose their provider network in October or the full extent of harm that had been or will continue to be caused by HealthNet.

On July 3, 1997, Aetna sued Mid–America Health Network, Inc. ("Mid–America") in the United States District Court for the District of Kansas and simultaneously filed its motion for a temporary restraining order and for preliminary injunction. On July 3, 1997, Judge Lungstrum entered a restraining order against Mid–America and set out a schedule to complete a preliminary injunction proceeding. On July 28, 1997, Aetna amended its complaint to include both Mid–America and HealthNet, Inc. Aetna's amended complaint seeks, among other things, specific performance. On August 7, 1997, the United States District Court for the District of Kansas granted Aetna's motion to amend its complaint and Aetna's motion for preliminary injunction. The preliminary injunction ran from August 7, 1997 up to and including October 1, 1998.

On November 11, 1997, HealthNet filed its notice of appeal. Prior to any ruling on appeal, the terms of the injunction expired and HealthNet dismissed its appeal.

### Conclusions of Law

HealthNet presents two major arguments against granting summary judgment on the issue of attorney fees. First, it argues such an award would be premature at the present time, since little if any discovery has occurred. According to HealthNet, the case was essentially frozen after the preliminary injunction, and the parties have never exchanged any initial information under Rule 26. Second, HealthNet stresses that the prior findings of the court—made in the context of a preliminary injunction hearing—are not controlling here, since the standard of proof is different. On both points, the court finds that while HealthNet is correct at a basic level, ultimately neither point provides grounds for denying the motion for summary judgment.

As to the question of discovery, it is true that little, if any, of it may have occurred. But HealthNet has not shown that it undertook any efforts at discovery during the long pendency of this case. Further, with a few exceptions such as a hypothetical "waiver" argument (discussed below), HealthNet has failed to identify any defenses which might be supported through additional discovery.

More importantly, the nature of the case is such that, in order to respond to the motion for summary judgment, it should not require extensive discovery: the plaintiff claims, *largely on the basis of HealthNet's internal documents and testimony from HealthNet's own officers,* that HealthNet deliberately violated confidentiality agreements by attempting to convert its payors and members. The evidence to rebut plaintiff's claim, assuming it existed, would be within HealthNet's control, and could be produced without the need for a delay in addition to the two years the matter has been pending before the court.

That the need for additional discovery should not warrant denial of the summary judgment may also be seen in HealthNet's specific responses to the 77 uncontroverted facts submitted by Aetna. Of these, the great majority are either admitted directly by HealthNet, or are disputed on other, but insufficient, grounds. In only a very few instances (Fact ¶¶ 6, 67, 68, and 69) does HealthNet respond by stating (on each occasion in a wholly conclusory fashion) that additional discovery is necessary. These paragraphs generally relate to the facts that (1) Aetna negotiated for the confidentiality agreements as a part of its standard practice of protecting such information, and (2) specific instances in which brokers responded to HealthNet's publica-

tions and letters. HealthNet has failed to specify what additional discovery on these subjects it would desire, or why it has failed to seek such discovery during the pendency of the present action. In any event, these narrow issues would not prevent a determination, on the basis of all the other facts, that HealthNet violated the contractual agreements between the parties and is responsible for Aetna's attorney fees.

With respect to HealthNet's other preliminary argument, that the standard of proof is different at the summary judgment stage, it is certainly correct. At the previous hearing, the court examined the evidence from the perspective of whether Aetna had provided evidence showing it would likely prevail at trial. Here, of course, the standard is essentially whether Aetna has proved its case beyond a reasonable doubt. Aetna has met this standard also. Even applying the more rigorous summary judgment standard, the factual narrative is not significantly altered from that previously presented to and recognized by the court.

 Specifically, HealthNet argues that it was entitled to respond to broker queries under § 2.15 of the agreements. Second, according to HealthNet, Aetna waived its current claims—that HealthNet improperly responded to broker queries in July of 1997, since HealthNet has always responded to such queries. Finally, HealthNet stresses that HealthNet, Inc. is a separate entity and cannot be bound to Aetna.

The court finds the last argument cannot stand in light of the evidence before the court. As noted earlier, the 1995 confidentiality agreement was expressly made in the name of "HealthNet," not Mid–America. If it was only that entity which was to be bound by the agreement, it should have been entered in the agreement in that name.

As to the larger question of the § 2.15 defense, this reflects a continuing inability or unwillingness on the part of HealthNet to comprehend either the essence of Aetna's claims or the court's earlier order. The problem, and the alleged breach of contract, has never been HealthNet's innocent response to spontaneous, independent inquiries from brokers. Rather, the breach arises from HealthNet's deliberate violation of the agreements between the parties by engaging in a public relations strategy which sought to generate such queries. § 2.15 does not authorize such behavior. Read as a whole, the agreements between the parties permitted HealthNet to respond to such broker queries, not to stimulate or manipulate them.

In this context, the court's earlier conclusion on the subject remains valid. The court wrote that HealthNet's interpretation

would have the effect of destroying any meaning for ¶ 2.15, since the uncontradicted evidence is that, with few exceptions, most marketing of access is accomplished through brokers rather than directly to payors. HealthNet's argument would have the effect of rendering meaningless an important and bargained-for provision of the Network Access Agreement. Second, the evidence establishes that brokers are in any event the agents of the payors. Communications directed at brokers are inherently directed at their clients.

More importantly, however, by its explicit terms the agreement prohibits HealthNet from 'marketing' its provider network to Aetna's payors. 'Marketing' by its nature is a broad term, incorporating acts which 'expose [a product] for sale in a market.' *See Webster's Ninth New Collegiate Dictionary* 1635 (Merriam–Webster 1984). In the modern commercial environment, 'marketing' is not restricted to direct, face-to-face communications, but encompasses all communications, direct or indirect, which have the intent of causing or assisting the dissemination of product information.

HealthNet's actions clearly had such an intent. Its communications to bro-

kers were only indirect parts of its strategy, since brokers themselves do not pay for access to providers. The brokers play a role only by serving payors, and the specific intent of HealthNet's disruption strategy was that these targeted payors would be the clients of Aetna. 975 F.Supp. at 1386. The evidentiary basis for these conclusions exists here as well. And it remains true that HealthNet's 1997 "aggressive communication strategy" had as its fundamental purpose the conversion of Aetna's customers to HealthNet. Indeed, HealthNet does not controvert the fact that during this time "it was scheming to convert Aetna's business." (Plf. Uncontr. Fact ¶ 36). The contracts clearly prohibit marketing to Aetna's payor's. But a part of HealthNet's scheme—its marketing scheme—involved the improper use of confidential Aetna customer information.

HealthNet's waiver argument is grounded on the same flawed understanding of the action. The essence of Aetna's complaint is not that HealthNet improperly responded to broker queries. It is that HealthNet wrongfully transferred confidential information to its marketing department, which used the information to assist in a marketing scheme which sought to generate broker queries. As such, to establish a defense of waiver, HealthNet would need to offer proof not only that Aetna knew of and tolerated HealthNet's prior responses to broker queries, but that Aetna knew of and tolerated the sort of marketing scheme which occurred in June and July of 1997. HealthNet, of course, has not offered any scintilla of evidence to support such a defense, or even suggested that it might exist. The evidence before the court establishes that, when Aetna learned of HealthNet's actions, it promptly acted to defend its interests.

The court finds that Aetna's motion is proper, and that in light of the uncontroverted evidence, the plaintiff is entitled to an award of attorney fees pursuant to the agreements between the parties.

Turning now to the procedure for determining attorneys' fees, the court directs the plaintiff to prepare, file and serve its application for such fees on or before February 14, 2000. Defendants shall prepare, file and serve their response to the application on or before March 7, 2000. The court will then determine whether a hearing is necessary and will notify the parties accordingly.

IT IS ACCORDINGLY ORDERED this 24th day of january, 2000 that the plaintiff's motion for summary judgment on the issue of attorney fees (Dkt. No. 892) is hereby granted.